UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ESPN, Inc.,

                              Petitioner,

                v.

Broadcast Music, Inc.,

                              Respondent.

16 Civ. 1067 (LLS)

Related to *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (LLS)

## RESPONSE OF BROADCAST MUSIC, INC. TO THE PETITION OF ESPN, INC. FOR THE DETERMINATION OF REASONABLE FINAL LICENSE FEES

   Broadcast Music, Inc. ("BMI") hereby submits this response to the Petition of ESPN, Inc. ("ESPN") for the Determination of Reasonable Final License Fees (ECF No. 1) (the "Petition").[1]

### INTRODUCTORY STATEMENT

   1.  ESPN has requested a through-to-the-viewer adjustable fee blanket license ("AFBL") from BMI for the period from 2010 through 2020 for each of its eight sports cable networks.  The through-to-the-viewer license requested by ESPN will cover all of ESPN's thousands of cable system operator affiliates, satellite carrier distributors, and myriad new internet and mobile delivery platforms.

   2.  As required by the terms of its consent decree,[2] BMI quoted a reasonable rate for the license requested that is in line with the prevailing market rates, including the last

---

[1]  Although ESPN's Petition is not a "complaint" under the Federal Rules of Civil Procedure (the "Rules") and thus responsive pleadings are not required under Rule 12, BMI believes that a response would be helpful to the Court for the purposes of framing the parties' dispute.  As BMI's response is not an "answer" under Rule 12, it does not address the allegations in ESPN's Petition on a paragraph-by-paragraph basis.  For the avoidance of doubt, however, BMI denies the substantive allegations contained in paragraphs 3, 4, and 8 of the Petition.

[2]  Final Judgment, Article XIV(A), *United States v. Broad. Music, Inc.*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966), as amended by 1996-1 Trade Cas. ¶ 71,378 (S.D.N.Y. 1994) (the "Consent Decree").

final ESPN-BMI license.  BMI's proposed license includes a rate that is consistent with licenses BMI has entered into (and, on multiple occasions, renewed) with more than 50 sports and news cable television networks over the past 15 years, including BMI's most recent license agreement with ESPN.  ESPN challenges the reasonableness of the rate quoted by BMI, but offers no compelling reason why it should pay only a fraction of the rate it agreed to pay for the previous decade, and the same rate paid by many other news and sports networks.  The market and ESPN's music licensing activities have remained essentially unchanged over the last twenty years.

3.     ESPN was previously licensed by BMI under a final agreement that expired in 2009.  Under that license, ESPN could elect a per program license ("PPL") or traditional blanket license for each network.  The PPL fee was calculated based on each network's music use.  ESPN engaged in significant source and direct licensing and elected a PPL for all but one of its networks, ESPN Classic.  Since 2009, ESPN has been operating under an interim agreement with BMI on the same terms as the parties' last final license.  Throughout the interim period, all of the ESPN networks other than ESPN Classic have continued to operate under a PPL.

4.     ESPN claims it has "distinguished itself with respect to, among other things, its programming and its music clearance practices" (Petition ¶ 4), such that it is fundamentally different from all other cable networks.  It is not.  ESPN is similarly situated to the myriad other sports and news cable networks licensed by BMI, each of which has virtually the same business model, programming mix, and overall music use.  There is simply no support for ESPN's faulty premise that source and direct licensing somehow changes those facts.  In addition, there have been no material changes to ESPN's music use, reliance on source and direct

2

licenses, or the economic circumstances it faces since 2006, when BMI and ESPN entered into their last final license agreement.  Thus, BMI has quoted a rate consistent with the historical rates and terms BMI negotiated with ESPN and its competitors.

5.     The multitude of benchmark agreements with other similarly situated cable networks confirms the reasonableness of BMI's base rate proposal.  The AFBL formula offered by BMI tracks closely the AFBL rates and terms previously approved by this Court, in particular the AFBL applicable to local television stations, and is similarly reasonable. Nonetheless, despite virtually no change to its economic circumstances or music licensing practices, ESPN seeks a dramatic reduction in its BMI rate and fees.  ESPN alleges that the blanket license rate on which the AFBL formula is based should be reduced to align with the value purportedly indicated by the source and direct licenses ("SDLs")[3] ESPN has negotiated with various songwriters, composers and publishers. Even assuming the extent of ESPN's claimed reliance on SDLs were true, something BMI has been unable to independently verify due to ESPN's continued failure to provide BMI with copies of its SDLs as required by the last final and current interim license agreements,[4] ESPN's argument is demonstrably flawed.

6.     First, unlike SDLs previously considered by this Court in *BMI v. Pandora* and *BMI v. DMX*, which were akin to "mini-blanket licenses" allowing unlimited use of a catalog of compositions, the SDLs ESPN purports to rely on are extremely narrow and grant only limited rights for certain audiovisual uses.  They cannot be used as a proxy for the value of the expansive rights conferred by the BMI blanket license.  They are simply a different product.

---

[3]  In the television industry, a direct license is a license entered into directly between the broadcaster and the songwriter, composer, or publisher.  With a source license, the broadcaster obtains the performance rights to the BMI music in a television program from the producer of the program who has obtained those rights from the songwriter, composer or publisher.

[4]  What little information ESPN has provided to BMI has been either inaccurate or incomplete such that BMI was unable to verify the existence or scope of many of ESPN's claimed SDLs.  ESPN last provided BMI with an SDL in 2013.

7.      Second, ESPN's SDLs are not an appropriate indicator of value for the BMI license because the SDLs ESPN obtains exclusively cover music in programming controlled by ESPN or programming that ESPN can readily substitute.  In contrast, ESPN relies on its BMI blanket license for music that it cannot easily substitute, where ESPN's leverage in a free market negotiation with songwriters, composers and publishers would be materially different.  This music is more similar to music in ESPN Classic programming for which ESPN has not adopted a direct licensing strategy.  ESPN has instead always elected a traditional blanket license for ESPN Classic and paid the standard industry rate.

8.      Finally, the value of music, which is the only value reflected in ESPN's SDLs, is only one of many components of the value of the blanket license offered by BMI.  Critically for ESPN—which broadcasts many commercials and live sporting events in which it does not control its use of music—these additional benefits include insurance against copyright infringement, relief from the need to separately identify each and every composition inserted into its programming, greatly reduced transaction costs, streamlined collection and payment of royalties, and immediate access to the more than 10.5 million works in BMI's repertoire.  Any rate must reasonably compensate BMI for the added value of the blanket license.

## THE PARTIES

9.      Founded in 1939, BMI is a music performing rights licensing organization (a "PRO") that operates on a non-profit-making basis.  BMI obtains the non-exclusive right to license the public performing right in musical compositions from songwriters, composers, and music publishers (collectively, BMI's "Affiliates").  BMI's repertoire presently consists of approximately 10.5 million musical works from the catalogs of approximately 700,000 Affiliates and covers the entire range of musical genres.

4

10.     BMI issues performing right licenses to music users, collects license fees from them, tracks musical performances, and distributes royalties to its Affiliates.  BMI licenses a broad range of music users across a wide array of industries including, *inter alia*, hundreds of broadcast and cable television networks.

11.     Through BMI, licensees obtain the right to publicly perform any and all of the works in BMI's repertoire.  In this way, BMI increases the availability of music to users, reduces transaction costs, and ensures that composers and music publishers are fairly compensated for the use of their works.

12.     ESPN is a "multimedia sports entertainment company that operates eight 24-hour domestic television sports networks[.]"  (The Walt Disney Co., Annual Report (Form 10-K) (Nov. 25, 2015) ("Disney 10-K") at 2.)  The ESPN networks are ESPN, ESPN2, ESPN Classic, ESPNews, ESPN Deportes, ESPN Today, ESPNU, and ESPN360.

13.     ESPN broadcasts live professional and college sports and sports-related news programs and documentaries.  ESPN's flagship network has 92 million subscribers.  (*Id.*) Upon information and belief, in 2014 ESPN generated approximately $11 billion in revenue.

14.     ESPN also operates ESPN.com, "which delivers comprehensive sports news, information and video" on computers and mobile devices, and WatchESPN, "which delivers live streams of most of ESPN's domestic networks" on computers and mobile devices to ESPN subscribers.  (*Id.* at 2-3.)

15.     ESPN controls the vast majority of the programming it broadcasts.  For two decades, ESPN has claimed to have entered into direct licenses with music publishers and composers, or required program producers to secure the music performing rights for the programming broadcast by ESPN.  Notwithstanding its purported extensive direct licensing

activities, ESPN has demanded and relied on access to a compulsory blanket license from BMI for music that is not otherwise licensed and for protection against infringement claims.

16. ESPN relies on its BMI license for music that is more expensive or less efficient to license directly and music that ESPN is unable or unwilling to identify. ESPN also relies on its BMI blanket license to provide the right to perform music included in broadcasts of live sporting events and music embedded in commercials. Such uses, generally referred to in the industry as "incidental and ambient uses" ("IAU"), are particularly important for sports networks like ESPN that focus heavily on live sporting events. Advertisers place a premium on live sporting events—there is no opportunity to skip advertisements during a live broadcast and it is therefore far more likely viewers will pay attention to commercials—and ambient stadium music is a critical component of the broadcast that allows ESPN to attract viewers by making them feel like they are sitting in the stadium cheering on their favorite team. ESPN has consistently obtained a license to cover its use of IAU music and paid a portion of its PPL fee for this purpose.

## THE DETERMINATION OF A "REASONABLE" RATE

17. When considering whether a rate quoted by BMI is reasonable, the rate court must attempt to approximate the "fair market value" of the license requested, *i.e.* the price that a willing buyer and a willing seller would agree to in an arm's-length transaction.

18. In so doing, rate courts look to other license agreements entered into by parties in comparable circumstances with comparable negotiating positions, for the same scope of rights. This so-called "benchmark" methodology is suggested by the BMI Consent Decree itself, which "enjoins disparate treatment of similarly situated licensees." (Consent Decree § VIII(A).)

19.    Courts have held that music licensees are similarly situated if they are in the same industry, operate similar businesses, and use music in similar ways with similar frequencies.  Television stations and cable networks can be similarly situated even if they vary greatly in audience size and/or revenue.

20.    As a general rule, individual choices regarding the use of SDLs should not be a factor in determining whether two entities are similarly situated.  For example, local television stations have adopted a wide range of direct licensing strategies but have been deemed to be "similarly situated" to, and therefore subject to the same license terms and fees as, stations that do not use any SDLs.  Entities can therefore be similarly situated irrespective of whether they both take a BMI license or find other ways in which to clear their music licensing permissions.

21.    Rate courts thus rely frequently on license agreements reached by the parties themselves or by other parties in comparable circumstances and for comparable rights. The output of this analysis is typically a "range of reasonableness" informed by the rates found in a competitive market.

22.    Critical to the benchmark analysis is determining whether the proposed benchmark covers the same scope of rights as the license requested from BMI.  ESPN ignores this requirement entirely when it asserts that its blanket license fee should "bear some proportional relationship" to the fees it pays for direct licenses to songwriters, composers and publishers.  (Petition ¶ 8.)  As discussed below, the scope of the SDLs used by ESPN is so fundamentally different from that of the AFBL requested from BMI that the SDLs are simply not comparable products.  A reasonable rate must reflect the total value of BMI's blanket license, which is, and has been consistently recognized to be, materially greater than the sum of its parts.

## THE BMI ADJUSTABLE FEE BLANKET LICENSE

23.     BMI traditionally issues blanket licenses which permit music users to perform any and all of the works in the BMI repertoire, without constraint, for the term of the license.  The blanket license confers benefits beyond the value of the music being licensed which must also be reflected in the rate proposed.  In particular, the BMI blanket license:

a.      Provides insurance against copyright infringement, allowing ESPN to perform publicly millions of works in the BMI repertoire whenever and however it wishes;

b.      Gives ESPN immediate access to works in the BMI repertoire, including new works the moment they are added;

c.      Allows ESPN to avoid the tremendous cost associated with identifying the music and finding the copyright owners of every song or composition performed;

d.      Decreases transaction costs, since the blanket license avoids the need to engage in individual negotiations for each composition performed;

e.      Creates a *de facto* ceiling on the cost of music for ESPN by allowing ESPN to decline to enter into a direct license if the fee demanded is above the proportional cost of the BMI blanket license; and

f.      Facilitates the collection and distribution of royalties to affiliated songwriters, composers, and publishers.

24.     ESPN has requested an AFBL.  An AFBL is a blanket license that provides the licensee with credits for performances of compositions in the BMI repertoire that are directly licensed by BMI Affiliates.  BMI has offered such a license with a standard formula for crediting ESPN for performances it directly licenses.[5]  Thus, ESPN will receive all of the

---

[5]   BMI has proposed calculating ESPN's AFBL fee based on the following formula:  ESPN AFBL Fee = Incremental Administrative Fee + Floor Fee + (Fee Subject to Credit x MUR).  The Incremental Administrative Fee accounts for the additional costs to BMI in administering the ESPN license.  The Floor Fee would compensate BMI for its traditional overhead costs as well as the "incidental and ambient" use of BMI-affiliated compositions on ESPN's programming.  The "MUR," or music use ratio, represents the percentage of all performances of BMI music that are licensed through BMI.  The MUR is applied to ESPN's Fee Subject to Credit, *i.e.* ESPN's base fee less the

benefits of the blanket license described above, with the added flexibility that will enable it to continue to implement its source and direct licensing strategy and reduce the fees it pays to BMI.

## ESPN'S SOURCE AND DIRECT LICENSES

25.     In stark contrast to the BMI blanket license, the SDLs that cover public performances of music by ESPN are narrow and tailored in scope.  Upon information and belief, in general, the SDLs relied on by ESPN convey the public performance right for a specific set of compositions or catalogs, for use in particular programs, to be aired at specific times and often for a limited period of time or number of performances.  They require advance identification of the music to be used.  They do not allow immediate and unlimited use of millions of compositions without prior notification or accounting, and are not appropriate benchmarks for the BMI blanket license.

26.     ESPN's suggestion that "the reasonable value of the performance of BMI-licensed music works by ESPN should bear some proportional relationship to ESPN's direct payments to publishers and songwriters" (Petition ¶ 8), ignores these fundamental differences. ESPN's SDLs include *only* the value of the specific compositions to which they apply, and only within the particular context and under the conditions specified in the SDLs.  In contrast, the BMI blanket license provides access to any, some, or all of the more than 10.5 million songs in BMI's repertoire for any purpose without any identification (advance or otherwise) and for any duration *and* confers upon licensees the protections and benefits described above.

27.     Thus, ESPN's SDLs are far from, as ESPN alleges, "the best available evidence of the value of public performances of music on ESPN" (Petition ¶ 8).  This argument is belied by the prior agreement between ESPN and BMI wherein the value of the music was

---

Incremental Administrative Fee and Floor Fee, as a means of crediting ESPN for its valid, executed, and verified SDLs.

negotiated for years without this argument being raised.  A reasonable license fee for a BMI license must consider and value all of the components of a BMI blanket license as it has with ESPN and others for decades.

### LICENSES WITH ESPN'S COMPETITORS SUPPORT THE REASONABLENESS OF BMI'S FEE PROPOSAL

28.     BMI's licensing of the cable television industry over the past thirty years stems from a series of agreements between the American Society of Composers, Authors and Publishers ("ASCAP"), a competing U.S. PRO, and cable television networks that settled a protracted rate court proceeding in *U.S. v. ASCAP (In re Application of Turner Broadcasting)*, referred to as the *Turner* litigation.  The "post-*Turner*" licenses set a three-tiered rate structure depending on the music intensity of the programming offered by the network.  Specifically, "music intensive" programming networks were assigned a rate of 0.9% of gross revenue, "general entertainment" programming networks were assigned a rate of 0.375% of gross revenue, and "news and sports" programming networks were assigned the lowest rate, or 0.1375% of gross revenue.

29.     Over the last decade, BMI has licensed **over 300 cable networks** at the established post-*Turner* rates, including 30 sports networks and 20 news networks, which have agreed to the standard rate applicable to news and sports programming.  Over the course of the last year, BMI has entered into or extended similar agreements with nearly all of ESPN's competitors through 2019.  Many of BMI's licenses with cable networks have been renewed multiple times.

30.     BMI's more than 300 post-*Turner* licenses are the best benchmark for the blanket license component of a new AFBL with ESPN.  ESPN argues that it "has distinguished itself" from its competitors because of, among other things, "its music clearance practices."

(Petition ¶ 3.)  These practices include ESPN's allegedly "unique" ability to "control its music usage and the degree to which [ESPN] is able to secure direct licenses for the public performance of the musical compositions embedded in its content."  (*Id.* ¶ 4.)  ESPN's music clearance practices are appropriately credited through the AFBL formula.  They should not form the basis of an overall license which has many more components than that which is being credited, and they do not justify deviating from the post-*Turner* standard blanket license rate or terms.

31.     Differences in source and direct licensing by similarly situated licensees does not bear on the reasonableness of the base blanket rate payable under a BMI blanket license.  Indeed, even if ESPN does differ in some respects from other cable networks,[6] ESPN's SDLs provide no basis to radically slash the BMI blanket rate as ESPN proposes.  By way of example, all local commercial television stations are licensed under the same negotiated fee structure despite the fact that some make extensive use of SDLs while others do not use them at all.  Stations that use SDLs elect more flexible license forms such as the PPL or the AFBL.  These alternative license forms maintain the base blanket rate, but allow a music user to reduce the actual fees it pays to BMI based on its use of SDLs.  ESPN has requested an AFBL for just that reason.

### THE PRIOR BMI-ESPN LICENSE SUPPORTS THE REASONABLENESS OF BMI'S RATE PROPOSAL

32.     On May 1, 2006, BMI and ESPN entered into a license agreement covering the period from February 28, 1995 through December 31, 2009 (the "2006 BMI-ESPN License" or the "License").

33.     ESPN had previously refused to license with BMI, and BMI was compelled to demonstrate to ESPN that, without a BMI license, each performance by ESPN of

---

[6]  Upon information and belief, ESPN's music use remains substantially similar to that of other sports cable networks that have agreed to the post-*Turner* rate.

BMI-affiliated compositions was an act of copyright infringement.  In 1996, ESPN (i) agreed to a flat fee settlement agreement with BMI to settle its past infringements and (ii) applied for and received from BMI an interim license as of February 28, 1995 at 0.2% of gross revenue, the then-prevailing industry wide interim rate for sports and news networks.  At or around that time, BMI negotiated the post-*Turner* interim rates with the basic cable television industry.

34.     A decade later, the 2006 BMI-ESPN License settled the interim license fees on a final basis for the period 1995 through 2005 at the new industry-wide blanket rate of 0.1375% and applied that same rate to a new final agreement going forward.  Because ESPN had been paying BMI at a higher rate on an interim basis, the 2006 BMI-ESPN License required BMI to refund to ESPN the difference between the higher interim rate and the final negotiated rate for the interim period (1995-2005).  Thus, the 2006 BMI-ESPN License covered the whole period from 1995 through 2009 at a final base fee blanket rate consistent with the post-*Turner* news and sports rate paid by ESPN's competitors.

35.     Long before the 2006 BMI-ESPN License, ESPN developed and implemented an extensive SDL strategy that it claims has remained unchanged to this day.  Although BMI has been unable to verify the extent of ESPN's use of SDLs, upon information and belief ESPN licenses through SDLs as much music as possible in its programming.  Accordingly, ESPN requested and received in the 2006 BMI-ESPN License a PPL option for any or all of its networks, as an alternative to the traditional blanket license.  The base fee under both the blanket license option and the PPL option was based on the post-*Turner* news and sports rate.  For each network as to which ESPN elected a PPL, the base blanket fee was adjusted according to a formula set out in the License.[7]

---

[7]  The License provided the following formula for calculating the per program fee:  ESPN PPL Fee = IAU Fee + Program Fee.  The Program Fee for a given year was calculated by multiplying (i) 155% of 77.5% of a given year's

36.     The PPL fee formula consisted of a "Program Fee" and an "IAU Fee." The Program Fee component was structured in a manner that allowed ESPN to decrease its blanket license fee to BMI as ESPN entered into SDLs covering more of its music, particularly music in programs that earned more advertising revenue.  For this reason, the License required ESPN to report its SDLs to BMI for verification.  ESPN flouted its reporting obligation and, despite BMI's objections and numerous attempts to work with ESPN to resolve the deficiencies, ESPN routinely failed to provide BMI with its SDLs or any other necessary data.  As a result, ESPN drastically reduced the fees it paid to BMI without providing all of the documentation required by the terms of the 2006 BMI-ESPN License necessary to prove that ESPN was indeed entitled to the credits it claimed under its PPL license against its BMI blanket license fee.[8]

37.     In addition, the Program Fee was calculated with reference to ESPN's gross revenues during the calendar year 2004.  BMI applied a fixed annual growth rate to ESPN's 2004 revenues as a means of the parties approximating ESPN's then-unknown 2006-2009 revenues.  Unexpectedly to BMI, ESPN's actual revenue growth far outstripped that estimate, resulting in ESPN paying below market fees to BMI.

38.     The IAU Fee component of the PPL called for the payment by ESPN of a set percentage of the network's blanket license fee irrespective of the amount of source and direct licensing being done by ESPN.  There was no link between the value of obtaining SDLs for non-IAU music and the IAU Fee ESPN paid.  Thus, even if ESPN had successfully licensed every second of non-IAU music in its programming, it still would have paid the entire IAU Fee.

---

base fee by (ii) the ratio of advertising revenue generated by ESPN programs that contained music licensed through BMI as compared to total advertising revenue.

[8]  Because ESPN has requested an AFBL, which will provide it with a credit for every performance of a BMI work that is otherwise licensed, BMI expects ESPN's final AFBL to include more comprehensive reporting requirements than the 2006 BMI-ESPN License.  Such requirements would be similar to those included in AFBLs that have been previously approved by this Court.

39.    The IAU Fee compensates BMI for its general overhead costs as well as the "incidental and ambient" use of BMI-affiliated compositions in ESPN's programming.  Such incidental and ambient uses included ESPN's performance of BMI-affiliated works in, among other things, commercials and promotional announcements, and music in live sporting events or news programming.  The parties recognized that ESPN would not seek to undertake the very difficult and costly effort to directly license IAU music.  It had never done so before.  As such, the IAU Fee was not subject to reduction, and thus acted as a floor fee in the overall license formula.  ESPN now asks the Court to ignore its agreement to pay for its use of IAU music for 20 years by using SDLs for unrelated music as a proxy for the overall value of its blanket license.

40.    ESPN's core business has not materially changed since the 2006 BMI-ESPN License was negotiated.  Upon information and belief, ESPN uses at least as much BMI music in its television programming today, and uses such music in a similar manner, as it did during the entire term of the 2006 BMI-ESPN License, and relies on its BMI blanket license to cover at least as much, if not more, of the BMI music performed.

41.    In addition, upon information and belief, ESPN's total performances of BMI-affiliated music have increased since the 2006 BMI-ESPN License expired as a result of ESPN's growing digital presence.  Millions of daily unique visitors to ESPN.com can now watch scores of video clips from ESPN's newscasts or the live sporting events it broadcasts or covers, and ESPN's millions more mobile app users can stream clips and full-length broadcasts on a daily basis.  Many of the clips themselves contain music and nearly all are embedded with commercials that include music.  If anything, this would support an increase in fees to BMI, further underscoring the reasonableness of BMI's proposal.  Instead, ESPN, one of the world's

14

largest and most successful cable networks, seeks to drastically slash the already modest rate it pays to BMI.

42.     The 2006 BMI-ESPN License represents an arm's-length transaction between a willing buyer (ESPN) and a willing seller (BMI).  It was negotiated and agreed to by the same parties contesting the current license under equivalent economic circumstances.  It also covers similar rights as the license at issue, although ESPN's use of BMI music on digital platforms has increased materially since 2006.  There is no compelling reason for the parties to deviate in any material way from the prevailing industry license rates and terms, many of which were affirmed by ESPN as reasonable by its negotiation and acceptance of the 2006 BMI-ESPN License.[9]

## ESPN MUST PAY BMI FOR INCIDENTAL AND AMBIENT USES OF MUSIC AND COMPENSATE BMI FOR THE COST OF ADMINSTERING THE LICENSE

43.     As discussed above, ESPN has requested an alternative rate structure—the AFBL—that allows ESPN the flexibility to enter into SDLs and reduce its fee to BMI while also permitting ESPN to reap the benefits and protections of the blanket license.  It is vital that BMI is compensated for these benefits regardless of the extent of ESPN's use of SDLs.

44.     BMI has proposed an AFBL fee formula that mirrors the formulas approved by this Court in *DMX, WPIX*, and *Pandora* and is reasonable.[10]  Like the AFBL in those cases, the proposed formula would credit ESPN for its reduced use of works licensed

---

[9]  Indeed, BMI has offered, at ESPN's request, an AFBL that will allow ESPN to reduce its fee to BMI to account for its SDLs, assuming ESPN complies with the proposed AFBL's reporting requirements.

[10]  *See Broad. Music, Inc. v. DMX, Inc.*, 726 F. Supp. 2d 355, 364 (S.D.N.Y. 2010); Final Order at Ex. 3, *WPIX, Inc. v. Broad. Music Inc.*, 09 Civ. 10366 (LLS) (S.D.N.Y. Dec. 12, 2014), ECF No. 86; *Broad. Music, Inc. v. Pandora Media, Inc.*, No. 13 Civ. 4037 (LLS), 2015 WL 3526105, at **24-25 (S.D.N.Y. May 28, 2015).

through BMI[11] and account for the considerable resources BMI must expend to administer the license. Consistent with the AFBL offered to the local commercial television broadcasters in *WPIX*, the proposed formula would also account for the different types of music uses on television, including IAU music.

45.     The inclusion of a fee to account for ESPN's IAU of music is consistent with the 2006 BMI-ESPN License. It is also consistent with the PPL agreed to by the local television industry—on which ESPN's PPL was based—and the local television industry's AFBL, which was approved by this court in December of 2015. The IAU portion of the license fee is designed to cover, among other things, the value of music in commercials, music in short clips captured in news broadcasts, and ambient music in sports event programs not inserted by the program producer (including the vast amounts of music played loudly and prominently in stadiums and arenas).

46.     The 2006 BMI-ESPN License affirms the reasonableness of an IAU fee, which is reflected in the AFBL formula as part of the floor fee. As it has since the mid-1990s, despite its purported extensive use of SDLs, ESPN continues to rely on its license with BMI to cover its use of IAU music which, by its very nature, is difficult for ESPN to identify and directly license. Upon information and belief, there is no evidence that ESPN's IAU music has decreased at all since 2006. In fact, upon information and belief, ESPN has increased the number of commercials it broadcasts since that time and, as noted above, ESPN has greatly increased its use of IAU music as the result of the distribution of its programming on its website and other mobile platforms.

---

[11]  As rate courts have recognized, a license with a crediting mechanism necessitates the identification of music used by the licensee to determine what is and is not compensable to BMI's Affiliates. BMI's proposed AFBL therefore requires the timely receipt and verification of ESPN's SDLs.

**RELIEF REQUESTED**

WHEREFORE, BMI respectfully requests that the Court enter an Order:

A.       Confirming as reasonable the rates and terms proposed by BMI for a license covering performances of music in the BMI repertoire by ESPN and directing ESPN to pay such license fees, effective as of January 1, 2010 and continuing through December 31, 2020; and

B.       For such other and further relief as this Court deems just and proper.

[*Remainder of page intentionally left blank*]

Dated:  March 8, 2016          MILBANK, TWEED, HADLEY & MCCLOY LLP
        New York, New York

                               /s/ *Scott A. Edelman*
                               Scott A. Edelman
                               Atara Miller
                               Eric I. Weiss
                               28 Liberty Street
                               New York, New York 10005-1413
                               Telephone: 212-530-5000
                               Facsimile: 212-530-5219
                               Email: sedelman@milbank.com

                               -and-

                               Stuart Rosen
                               Joseph J. DiMona
                               7 World Trade Center
                               250 Greenwich Street
                               New York, New York 10007

                               *Attorneys for Respondent Broadcast Music, Inc.*